**NONPRECEDENTIAL DISPOSITION**

To be cited only in accordance with

Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**

**Chicago, Illinois 60604**

Argued January 26, 2011

Decided February 4, 2011

*Before*

WILLIAM J. BAUER, *Circuit Judge*

JOEL M. FLAUM, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

No. 10-3019

| | |
|---|---|
| UNITED STATES OF AMERICA, <br>     *Plaintiff-Appellee*, | Appeal from the United States District <br> Court for the Southern District of Illinois. |
| *v.* | No. 3:09CR30181-001-DRH |
| JOSE LUIS CALVO-SAUCEDO, <br>     *Defendant-Appellant*. | David R. Herndon, <br> *Chief Judge*. |

**O R D E R**

Police in southern Illinois stopped Jose Luis Calvo-Saucedo for a traffic violation and found almost 10 kilograms of cocaine concealed within the rocker panels beneath the doors of his car. Calvo entered a conditional guilty plea to possession with intent to distribute, *see* 21 U.S.C. § 841(a)(1), reserving the right to challenge on appeal the denial of his motion to suppress. The district court concluded that the roadside search was conducted with probable cause and consent, but Calvo argues that (1) probable cause was lacking until an officer pried up a strip of interior molding that covered a rocker panel and punctured a package of cocaine, and (2) the removal of the molding exceeded the scope of his oral consent. The court's finding of consent is not clearly erroneous, and we agree with the determination of probable cause. We thus affirm the judgment.

Calvo was alone in a 4-door, 2003 Pontiac Grand Am when he was stopped on Interstate 55 by Kevin Thebeau, a Granite City police officer, and his partner, Todd Husky, a Troy police officer. Both officers are assigned to a DEA task force and devote their time to drug interdiction on the interstate. In moving to suppress, Calvo conceded that he gave Officer Thebeau valid, oral consent to search the car. For purposes of this appeal, moreover, Calvo concedes that police had probable cause to search his car, including by intrusive means, the minute that suspected cocaine was discovered under the molding. Accordingly, this appeal turns on whether Thebeau had a legal entitlement to pry up the molding, either because he already had probable cause to search or because that action was within the scope of Calvo's consent.

At the suppression hearing, Officer Thebeau testified that he first became suspicious when he saw Calvo, whose car was ahead of the officers, reach several times for an object inside the vehicle. The Grand Am then veered sharply to the right off the roadway to reach a missed exit ramp, so Thebeau and his partner stopped Calvo for improper lane usage. When Thebeau approached the passenger side of the Grand Am and motioned for Calvo to roll down the front passenger window, he noticed that Calvo was unshaven and dirty, his hands were shaking, and he had difficulty finding the switch to lower the window. A Mexican passport and cigarette packages with Spanish labeling were visible on the front seat, the interior of the car was cluttered and littered with fast-food wrappers, and the key in the ignition was on a ring by itself. After Calvo opened the window, Thebeau detected a strong chemical odor similar to silicone caulk, though nothing on the car appeared to have been recently repaired. Thebeau had been trained that a single key could mean that the vehicle was a drug courier's "drop car" which could be left with its cargo at the delivery point for someone else to retrieve, and he suspected that the chemical agent either was being used to mask the smell of drugs or else was emanating from material used to seal off compartments hiding drugs. Thebeau eventually learned that Calvo had a valid Indiana driver's license and a registration in his name for the car, but as the stop unfolded Thebeau observed that Calvo was fidgeting and apparently was so nervous that his breathing was labored. Calvo explained that he was on his way home after visiting a friend in St. Louis, but Thebeau thought the passport and cigarettes undercut that story. Even when Thebeau had returned to his car after telling Calvo that he would issue only a warning for the traffic violation, Calvo kept looking in the mirror and turning around to watch the officers.

Thebeau handed Calvo a written warning. He then asked Calvo if there were "illegal narcotics or large sums of currency" in his car, and Calvo said no. Thebeau then asked to search the Grand Am, making sure to inquire whether Calvo understood the word "search," since Calvo had said that he speaks Spanish and only limited English. Calvo gave permission to search. During the search Thebeau used a pocket knife to pry off a strip of

interior molding (Thebeau characterized the molding as a "rubber strip" during the suppression hearing) that covered the rocker panel under the front passenger door. Rocker panels, essentially the frame of the car below the doors, are hollow, and on that model of Grand Am, strips of molding cover the interior surface of the rocker panels and are held in place with small clips that snap into holes in the panel. Thebeau had pried up similar moldings "hundreds" of times before after learning that drugs sometimes are concealed in the void created by a rocker panel, and he maintained that this action had not damaged the Grand Am. When Thebeau peered into one of the holes where a clip for the molding had been, he saw what appeared to be cloth instead of empty space. Thebeau poked his knife into the hole and through the material, and withdrew white powder—cocaine—on the blade. All the while, according to Thebeau, Calvo was standing in view with Officer Husky but said nothing while watching Thebeau remove the molding and explore underneath. Once the powder was discovered, Thebeau and his partner obtained Calvo's written consent (in both Spanish and English) to a more-invasive search. The police then towed the car, cut open the rocker panels, and found cocaine under all four doors. Hidden compartments accessible from under the car had been sealed with red "bondo," and the car's exterior molding had been reattached with a silicone adhesive.

Calvo was the only other witness at the suppression hearing. He answered two questions: On direct examination he testified that he saw "very little, almost nothing" of the search Officer Thebeau had conducted on the passenger side, and on cross he conceded that he "never said anything" as Thebeau worked.

The district court denied the motion to suppress, concluding that Thebeau had probable cause to search the car—especially in light of his experience and training with drug enforcement—based on Calvo's appearance and behavior, the items in the vehicle, and the smell of silicone. The court also concluded that, even if there wasn't probable cause, removal of the molding to search inside the rocker panel was within the scope of Calvo's consent. The court found that Calvo had witnessed the entire search, including the removal of the molding, but never voiced any objection or hinted that his consent had been exceeded. The court also found that Calvo had not proved that Thebeau damaged his car.

On appeal Calvo argues that the search exceeded the scope of his consent. We disagree. The district court found that, even if Calvo's initial consent was somehow limited in scope, he agreed to broaden his consent to include the removal of the molding by watching but failing to protest Officer Thebeau's actions. That finding is not clearly erroneous; Thebeau testified that Calvo became more nervous as he searched near the rocker panel, and the burden was on Calvo to limit the scope of his consent. *See United States v. Patterson*, 97 F.3d 192, 195 (7th Cir. 1996); *United States v. Stribling*, 94 F.3d 321, 324 (7th Cir. 1996); *see also United States v. Mayo*, 627 F.3d 709, 714-15 (8th Cir. 2010) (upholding

search that included prying open door panels when defendant did not protest); *United States v. Gregoire*, 425 F.3d 872, 880-81 (10th Cir. 2005) (upholding search that included drilling holes and prying away portion of vehicle's undercarriage when defendant did not protest); *United States v. Marquez*, 337 F.3d 1203, 1208-09 (10th Cir. 2003) (upholding prying up nailed-down plywood when defendant did not protest).

Moreover, even if Calvo could not see Officer Thebeau's search, lifting the molding was within the scope of Calvo's initial consent. When a person is informed that an officer is looking for drugs in his car and he gives consent without explicit limitation, the consent permits law enforcement to search inside compartments and containers within the car, so long as the compartment or container can be opened without causing damage. *See Florida v. Jimeno*, 500 U.S. 248, 251-52 (1991); *United States v. Siwek*, 453 F.3d 1079, 1085 (8th Cir. 2006); *United States v. Garrido-Santana*, 360 F.3d 565, 576 (6th Cir. 2004); *United States v. Torres*, 32 F.3d 225, 232 (7th Cir. 1994). Calvo tries to equate this search to the conduct in *United States v. Garcia*, 897 F.2d 1413, 1419-20 (7th Cir. 1990), where we concluded that a general consent did not extend to dismantling a car door to remove drugs inside, but that decision is distinguishable. At the suppression hearing Calvo tried to establish that Thebeau had damaged the molding by removing it, but the district court concluded that the evidence did not support that assertion. That finding is not clearly erroneous; at the suppression hearing, Calvo presented Thebeau with a photo that Calvo claimed showed damage to the molding, and—although Thebeau agreed that the backside of the molding in the picture looked slightly damaged—he expressly denied that he damaged the molding during the search and said that he could not even tell whether the photo depicted the same molding. Therefore, the officer's actions were within the scope of what a reasonable motorist would expect after giving general consent to search a car for contraband. *See United States v. Garcia*, 604 F.3d 186, 190-91 (5th Cir. 2010) (upholding removal of speaker cover secured by screws); *Siwek*, 453 F.3d at 1085 (upholding use of wire probe to search inside drain hole because any damage caused was de minimis); *Garrido-Santana*, 360 F.3d at 576 (upholding search of gas tank); *Torres*, 32 F.3d at 232 (upholding search where police unscrewed six screws to look inside wooden box).

Calvo's remaining argument about probable cause poses a closer question. Calvo contends that Officer Thebeau lacked probable cause to search before he removed the molding and looked inside the rocker panel. When there is probable cause to believe that a car contains contraband or evidence of criminal activity, police may conduct a warrantless search of any area where the items might be found. *Arizona v. Gant*, 129 S. Ct. 1710, 1721 (2009); *United States v. Nicksion*, Nos. 09-3732 & 09-3755, 2010 WL 4978819, at *6 (7th Cir. Dec. 6, 2010). Authorities have probable cause if, based on the totality of circumstances, there exists a fair probability of findings the items. *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *United States v. Zahursky*, 580 F.3d 515, 521 (7th Cir. 2009). Here, not only was Calvo

excessively nervous during the traffic stop and disheveled in appearance, but there were other signs that supported Thebeau's conclusion that Calvo was smuggling drugs from Mexico: the strong smell of silicone, known to Thebeau as a masking agent for the smell of drugs or a sealant for hidden compartments, the ignition key alone on the ring, and the items in the car that cast doubt on Calvo's story about traveling from St. Louis. Although these factors at least give rise to reasonable suspicion, *see United States v. Mason*, No. 07-4900, 2010 WL 4977817, at *4 (4th Cir. Dec. 8, 2010); *United States v. Faison*, 195 F.3d 890, 894 (7th Cir. 1999), in most instances where probable cause has been found on analogous facts there have been more-obvious signs of a hidden compartment, *see United States v. Banuelos-Romero*, 597 F.3d 763, 767-69 (5th Cir. 2010); *United States v. Ledesma*, 447 F.3d 1307, 1316-19 (10th Cir. 2006); *United States v. Anderson*, 114 F.3d 1059, 1066 (10th Cir. 1997); *United States v. Inocencio*, 40 F.3d 716, 723-24 (5th Cir. 1994). Still, the absence of any single factor is not determinative, *see Faison*, 195 F.3d at 894, and we agree with the district court —even without telling indicia of a hidden compartment—that this collection of seemingly innocent factors, combined with Thebeau's training and experience, gave rise to probable cause to search the Grand Am. *See United States v. Castelo*, 415 F.3d 407, 412 (5th Cir. 2005) (upholding search based on alteration of registration, dubius story, nervousness, lack of seal on trailer, and connection to "source city" for drugs); *United States v. Saucedo-Munoz*, 307 F.3d 344, 350-51 (5th Cir. 2002) (upholding search based on nervousness, inoperable gas gauge, and short time before running out of gas, which the officer knew were signs that drugs may be hidden in gas tank); *Faison*, 195 F.3d at 894 (upholding search based on odor of bug spray, known to police as a masking agent for smell of drugs, along with driver's agitation, sloppy trucking paperwork, and lie about carrying cargo); *see also Gates*, 462 U.S. at 243 n.13 (noting that "innocent behavior frequently will provide the basis for a showing of probable cause"); *United States v. Funches*, 327 F.3d 582, 587 (7th Cir. 2003) ("[T]he mere existence of innocent explanations does not necessarily negate probable cause . . . ."); *United States v. Gil*, 58 F.3d 1414, 1418 (9th Cir. 1995) ("[O]bservations of conduct consistent with drug trafficking, even though apparently innocuous, can give rise to probable cause.").

AFFIRMED.