In the

# United States Court of Appeals

### For the Seventh Circuit

No. 11-2457

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MARGARITO SAUCEDO,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 3:10-cr-30010-RM—**Richard Mills**, *Judge.*

ARGUED APRIL 2, 2012—DECIDED AUGUST 6, 2012

Before ROVNER, SYKES, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Margarito Saucedo appeals the denial of his motion to suppress, contending that the search of his tractor-trailer exceeded the scope of his consent to search. We affirm.

I.

On January 11, 2010, Trooper Nathan Miller of the Illinois State Police stopped a Peterbilt tractor-trailer

because it had a paper registration plate that appeared to be expired. The truck was driven by Margarito Saucedo. Trooper Miller confirmed that the plate had expired in November 2009 and ran the truck's U.S. D.O.T. number. Trooper Miller advised Saucedo of the reason for the stop—the expired plate—and Miller also advised Saucedo that he would be conducting a motor carrier safety inspection. Trooper Miller requested Saucedo's driver's license, logbook, and paperwork for the truck, trailer, and load. Saucedo handed over his license, documentation referencing his license, and other paperwork; he had no information pertaining to the load because his trailer was empty. Trooper Miller ran Saucedo's license and learned that it was invalid.

Trooper Miller and Saucedo proceeded to Miller's squad car to speak further. The trooper checked Saucedo's criminal history and learned that he had prior convictions for drug distribution and aggravated assault with a deadly weapon. Trooper Miller asked Saucedo whether he had any weapons or was carrying any drugs in the truck or trailer. Saucedo volunteered that the trooper could "open it." Trooper Miller then asked Saucedo if he could search his truck and trailer, and Saucedo said, "yes." The trooper again asked Saucedo if he had any weapons, marijuana or cocaine, and Saucedo said he had "nothing." At no time did Saucedo limit the scope of the search.

While speaking with Saucedo, Trooper Miller was in contact with other law enforcement officers because of Saucedo's criminal history and because Miller saw some

things that raised his suspicions, including an overabundance of religious paraphernalia and air fresheners and three cell phones. In addition, Saucedo had given Miller documentation that noted problems with Saucedo's driver's license. Trooper Miller contacted a certified canine unit for assistance.

With Saucedo still in the squad car and having obtained his consent to search, Trooper Miller conducted a search of the truck and trailer. He began with the trailer, which was empty. He moved to the tractor and escorted the passenger, Saucedo's cousin, to an officer's vehicle. Miller returned to the cab of the truck and began his search. Within a few minutes, he found what he thought was an alteration to a small alcove that housed a compartment in the sleeper/bunk area behind the driver's seat. Trooper Miller was familiar with the bunks in Peterbilt trucks and that drew his attention to the alcove's black TV and its silver outlining. Using his flashlight, he could see that the alcove appeared altered—the TV's silver outlining showed a depth of the alcove that, in his words, "was most certainly not correct." So he searched. He used a screwdriver to disassemble one screw, pulled back the plastic molding around the alcove, peered in, and found a hidden compartment.

Trooper Miller returned to his squad car and placed Saucedo in a deputy's squad car with his cousin. By then the canine unit, Trooper Maro and his dog Vik, had arrived. Trooper Miller returned to the cab, removed the TV and three remaining screws from the molding, and

removed the hidden compartment from the alcove. He opened it up and found 10 kilograms of cocaine inside. Trooper Maro then walked Vik around the truck and Vik alerted at the truck's side.

At that point, Trooper Miller had further discussions with Saucedo. At no time did Saucedo indicate that he had any difficulty with the English language. Miller told Saucedo what he had found. But before telling Saucedo where he found the cocaine, Trooper Miller asked him where he thought it had been found. Saucedo said he thought the cocaine was found behind the TV. Saucedo did not object to the nature of the search or the fact that Trooper Miller had looked in the hidden compartment. Trooper Miller asked Saucedo whether his truck had been searched before; Saucedo said that it had.

Unsurprisingly, Saucedo was arrested. Trooper Miller asked Saucedo why he had given his permission to search even before Miller asked for it. Saucedo explained that he'd been searched before and nothing was found. At one point, Saucedo advised Trooper Miller that he had diabetes, wasn't feeling well, and asked Miller to retrieve one of his prescriptions. Miller did so.

A grand jury charged Saucedo with conspiracy to possess with intent to distribute five or more kilograms of cocaine. Saucedo moved to suppress the cocaine and the magistrate judge held an evidentiary hearing. The judge found that Saucedo "clearly understood English fluently at the time of the stop and knew that he was consenting to the search of the entire tractor-trailer" and that "Saucedo was suffering no ill effects due to his

condition at the time of the traffic stop . . . that affected his ability to comprehend his situation or to make intelligent decisions." The judge also found that Saucedo volunteered his consent, that Trooper Miller confirmed that he could search both the tractor and trailer, and that "Saucedo did not indicate any limitations on the scope of his consent." The district judge adopted the recommendations and denied the suppression motion. Saucedo was tried by a jury, convicted as charged, and sentenced to 240 months' imprisonment. He appeals the denial of his suppression motion.

## II.

Saucedo argues that Trooper Miller exceeded the scope of his general consent to search the tractor-trailer by using a flashlight and screwdriver to remove screws holding the molding in place that covered a hidden compartment in the tractor. (Saucedo does not contest that his consent was freely and voluntarily given.) We review the district court's factual findings for clear error and its legal conclusions de novo. *United States v. Jackson*, 598 F.3d 340, 344 (7th Cir.), *cert. denied*, 131 S. Ct. 435 (2010).

Consent to search is an exception to the Fourth Amendment's warrant requirement, *id.* at 346, but the search must remain within the scope of consent, *id.* at 348. Whether a search remains within the scope of consent "is a question of fact to be determined from the totality of all the circumstances." *Id.* (quotations and citation omitted). "The standard for measuring the scope of

consent under the Fourth Amendment is one of objective reasonableness and asks what the typical reasonable person would have understood by the exchange between the law enforcement agent and the person who gives consent." *Id.*

"The scope of a search is generally defined by its expressed object." *Florida v. Jimeno*, 500 U.S. 248, 251 (1991) (citation omitted) (holding that suspect's general consent to search his car included consent to search containers within the car that might contain drugs where suspect placed no explicit limitation on the scope of the search and was aware that the officer would be looking for drugs). "Where someone with actual or apparent authority consents to a general search, law enforcement may search anywhere within the general area where the sought-after item could be concealed." *Jackson*, 598 F.3d at 348-49. We have stated, albeit in an unpublished order: "When a person is informed that an officer is looking for drugs in his car and he gives consent without explicit limitation, the consent permits law enforcement to search inside compartments and containers within the car, so long as the compartment or container can be opened without causing damage." *United States v. Calvo-Saucedo*, 409 F. App'x 21, 24 (7th Cir. 2011). And as the Supreme Court explained, "[a] reasonable person may be expected to know that narcotics are generally carried in some form of a container. Contraband goods rarely are strewn across the trunk or floor of a [vehicle]." *Jimeno*, 500 U.S. at 252.

Here, Trooper Miller asked Saucedo if he had any weapons, cannabis or cocaine in his truck or trailer, and

Saucedo answered "no." At that point, Saucedo volunteered that Miller could search, even before Miller requested permission. Trooper Miller specifically asked Saucedo if he could search his truck and trailer, and Saucedo answered, "yes." So Saucedo was well aware that Miller was looking for drugs. And Saucedo gave his consent to search without any express limitation. Thus, his consent allowed Miller to search inside compartments in the tractor-trailer, including in the sleeper area, where drugs could be concealed. This necessarily included the hidden compartment, which one could reasonably think might, and in fact did, contain drugs. If Saucedo didn't want the hidden compartment to be searched, he could have limited the scope of the search to which he consented. *See id.* (stating that one may "delimit as he chooses the scope of the search to which he consents. But if his consent would reasonably be understood to extend to a particular container, the Fourth Amendment provides no grounds for requiring a more explicit authorization."). He did not. A reasonable person would have understood that by consenting to a search of his tractor and trailer for drugs, Saucedo agreed to permit a search of any compartments or containers therein that might contain drugs, including the hidden compartment where the cocaine was ultimately found. *See, e.g.*, *id*. at 251.

Saucedo argues that the search exceeded the scope of his consent because Trooper Miller used a flashlight and screwdriver to look behind a TV, unscrew the molding, and remove the hidden compartment from the alcove. The trooper's actions, Saucedo claims, contradicted the

principle that "general permission to search does not include permission to inflict intentional damage to the places or things to be searched." *United States v. Torres*, 32 F.3d 225, 231-32 (7th Cir. 1994) (quotation omitted); *see also United States v. Garcia*, 897 F.2d 1413, 1419-20 (7th Cir. 1994) (concluding that the dismantling of door panels extends beyond a general consent to search a vehicle because "[t]he opening of door panels is not normally included in this set of areas to be searched [for drugs or weapons]" and "[s]uch a search is inherently invasive"). Saucedo did not assert in the district court that Trooper Miller damaged the truck and thus forfeited this argument. Forfeiture aside, the argument has no traction. Trooper Miller's actions were not as invasive as the dismantling of the doors in *Garcia*. 897 F.2d at 1416 (officers peered through window slot in door panels and removed door panel).

Rather, this case is similar to *Torres* and *United States v. Garcia*, 604 F.3d 186 (5th Cir.), *cert. denied*, 131 S. Ct. 291 (2010). In *Torres,* an officer used a screwdriver to remove six screws that secured the cover of a wooden compartment in a trailer. *See* 32 F.3d at 228. We held that it was objectively reasonable for the officer to believe that the scope of consent allowed him to open the compartment by unscrewing the screws. *Id.* at 232. We distinguished the officer's actions in merely releasing and removing the screws to allow inspection of the compartment's contents with a dismantling of the fabric of the trailer. *Id.* In *Garcia*, while searching the cab of a truck, an officer used a screwdriver to remove screws

securing a stereo speaker, removed the speaker cover, and found cocaine. 604 F.3d at 189. In concluding that the search was within the scope of consent, the court noted that there was no structural demolition and the defendant knew the speaker cover was easy to unscrew and replace without causing damage. *Id.* at 190-91. Saucedo suggests that Trooper Miller's actions caused damage, but without any evidence that either the compartment or tractor was damaged. The removal of the hidden compartment did not dismantle any functional part of the tractor; the compartment had no function other than to conceal drugs, as Saucedo conceded at oral argument. In contrast, the door panel removed during the search in *Garcia*, 897 F.2d at 1416, in part had a legitimate function, as Saucedo also conceded at argument.

Next, Saucedo argues that a reasonable person in his shoes would have believed he was consenting to a search for items that could be identified with the five senses alone, without the assistance of tools. He compares the hidden compartment to a locked briefcase found in a trunk. In *Jimeno*, the Court said that it would be "likely unreasonable to think that a suspect, by consenting to the search of his trunk, has agreed to the breaking open of a locked briefcase within the trunk, but it is otherwise with respect to a closed paper bag." 500 U.S. at 251-52. But accessing and opening a hidden compartment is quite different from opening a locked briefcase or other container. Even though the hidden compartment was covered by a panel, it was not a locked compartment that would routinely be present in such a

vehicle, and it was easy for Trooper Miller to unscrew the molding and remove the compartment.

Although Saucedo focuses on the hidden compartment's location in the tractor's sleeping area rather than in the cab, he doesn't offer any reason why the location matters, particularly since he gave broad consent to search his tractor and trailer without limitation. His view contradicts the rule that officers conducting a consent search "may search anywhere within the general area where the sought-after item could be concealed." *Jackson*, 598 F.3d at 348-49. The sleeping area is within the tractor and, as the facts demonstrate, drugs could be—and were—concealed there.

Saucedo complains that he did not have the opportunity to object to the search's scope because he was seated in the squad car and out of view. He acknowledges that we have permitted officers to search for and open hidden compartments in vehicles based on a general consent to search the vehicle. *See, e.g., Torres*, 32 F.3d at 231-32 (upholding search where officer used screwdriver to release six screws and allow removal of the cover of a wooden compartment); *accord Garcia*, 604 F.3d at 190-91 (upholding search of truck cab where officers used screwdriver to remove screws securing speaker cover as within the scope of consent to search the truck and trailer). In those cases, that the suspect observed the search and did not object was *not* a necessary condition to finding that the search was within the scope of consent. *See, e..g., Calvo-Saucedo*, 409 F. App'x at 24 (holding district court did not clearly err

in finding that "even if [suspect's] initial consent was somehow limited in scope, he agreed to broaden his consent . . . by watching but failing to protest" the officer's actions in removing the molding and "even if [the suspect] could not see [the] search, lifting the molding was within the scope of [his] initial consent"); *Torres*, 32 F.3d at 231 (relying on the breadth of consent given to search "any part, compartment, or trunk of the vehicle and the contents of any object or container found therein"). Instead, we contrasted what the suspect did or didn't do with what he could have done to limit or withdraw the scope of the broad consent he had already given. *See, e..g., Torres*, 32 F.3d at 231 (suspect stood by silently as officer requested, obtained, and used a screwdriver to open the box); *United States v. Maldonado*, 38 F.3d 936, 940 (7th Cir. 1994) (suspect gave agents consent to search his luggage for drugs and nodded his head in response to agent's request for further consent to search juicer boxes found inside luggage).

As for Saucedo's other arguments, the magistrate judge found that Saucedo was not suffering ill effects due to his diabetes at the time of the traffic stop or during the search that affected his ability to comprehend the situation or make intelligent decisions. The district judge adopted the magistrate judge's findings. Saucedo has not shown that these findings were clearly erroneous. Nor has he shown that the court clearly erred in finding that he spoke and understood English fluently at the time of the stop and knew he was consenting to the search of the entire tractor-trailer.

Furthermore, contrary to Saucedo's claim, upholding the district court's decision does not mean that whenever law enforcement officers mention drugs and then ask for consent to search a vehicle, they may take apart any portion of the vehicle in search of drugs. Officers would still be limited by what is objectively reasonable under the circumstances, and a general consent to search does not authorize them to "inflict intentional damage to the places or things to be searched." *Torres*, 32 F.3d at 231-32. Of course, as noted, suspects may limit the scope of a consent search. *See, e.g.*, *Jimeno*, 500 U.S. at 252.

### III.

We affirm Saucedo's conviction and the district court's judgment.