

# NUMBER 13-17-00323-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

| | |
|---|---|
| **PABLO ERNESTO VILLARREAL JR.,** | **Appellant,** |
| **v.** | |
| **THE STATE OF TEXAS,** | **Appellee.** |

### On appeal from the 377th District Court
### of Victoria County, Texas.

# OPINION

### Before Justices Rodriguez, Contreras, and Benavides
### Opinion by Justice Rodriguez

By three issues, appellant Pablo Ernesto Villarreal Jr. appeals the denial of his motion to suppress. We affirm.

## I. BACKGROUND

Villarreal was arrested and charged with manufacture or delivery of cocaine in an amount of 400 grams or more, a felony of the first degree with a minimum term of fifteen

years.  *See* TEX. HEALTH & SAFETY CODE ANN. § 481.112(f) (West, Westlaw through 2017 1st C.S.).  The charge stemmed from a traffic stop that occurred on Saturday, April 13, 2013.  Villarreal moved to suppress evidence obtained as a result of the stop.

At the suppression hearing, Officer Shannon Jones testified that on the date of the traffic stop, he received a report from U.S. Border Patrol that a possible narcotics courier was coming through the area.  According to Jones, the truck had been flagged by a license plate reader at a border patrol checkpoint.  Jones recalled that the report included "vehicle identification," its probable routes, and possibly some license plate information. He relayed this information to other officers including Trooper Wayne Cipriani.

According to Cipriani, the vehicle was described as a blue truck tractor with a "Freight Movers" company logo on the side, pulling a flatbed trailer.  Cipriani saw a similar blue semi with a flatbed trailer at a gas station in Victoria, Texas.  He and his partner decided to park a short distance away and wait for the truck to leave the gas station.  When the truck left, Cipriani followed.  Cipriani testified that as the truck approached a stop sign, it came to a halt five or six feet over the stop line, and he detained the driver for this traffic infraction.  *See* TEX. TRANSP. CODE ANN. § 544.010(c) (West, Westlaw through 2017 1st C.S.).  The driver of the truck was Villarreal.

At the suppression hearing, Villarreal challenged the validity of the initial stop. The State introduced photographs of the stop sign showing that, as of 2015, the stop line was barely visible on the pavement, with only a few traces of white paint remaining. However, Cipriani testified that on the day of the traffic stop in 2013, the stop line was clearly visible on the ground and that Villarreal's truck was stopped far beyond it.  The

2

State also called Michael Walsh, a traffic engineer for the Texas Department of Transportation, who explained that heavy traffic can wear away a stop line over time.

Cipriani testified that once he initiated the stop, he saw that the logo on the side of the truck matched the one described in the border patrol report. Cipriani asked Villarreal to step out of the vehicle and began questioning him about his trip and his truck. The patrol car's dashcam captured their conversation. Villarreal explained that he had come from Mission, Texas early that morning. In response to Cipriani's questions, Villarreal stated that he was leasing the trailer from a friend, but he was going to Houston to drop it off because he did not want to pay for it anymore, and that his wife had made arrangements to buy another trailer. When Cipriani asked why Villarreal was not hauling any cargo, Villarreal responded that he had not worked for the past five days because his hauling tarps had been stolen the week before and he could not find a load to carry.

Cipriani asked to see Villarreal's log book, and Villarreal obliged. The log book confirmed that Villarreal had not worked in five days. Cipriani asked Villarreal whether he had any guns, knives, or needles, which Villarreal denied. Cipriani frisked Villarreal and took his cell phone, which he placed in the cab of Villarreal's truck as he inspected the vehicle. Cipriani testified that, during the inspection, he noticed the smell of fresh paint emanating from the vehicle. When Cipriani questioned Villarreal about the smell of paint, Villarreal explained that he had the truck's frame and hitch painted when he purchased the vehicle months earlier. Still, Cipriani viewed the smell of fresh paint as suspicious; he associated the smell of fresh paint with hidden compartments which had been recently painted so "law enforcement can't see that there has been recent tooling or fabrication done to the vehicle or trailer."

3

Roughly ten minutes into the stop, Cipriani told Villarreal that he would issue him a warning for failure to stop at the stop sign. He then radioed dispatch to request a check on Villarreal's border crossings. While waiting for the results of the crossing check, Cipriani questioned Villarreal about his truck, his plans, his trucking business, and his arrest record. Cipriani's radio request soon came back negative for border crossings.

Cipriani testified that he found it suspicious that Villarreal was not carrying any cargo, because Villarreal would be losing money by taking the time and expense of driving to Houston and staying overnight without a load, and because the local economy was doing well at that time, so loads should have been available. Cipriani also felt it was irregular that Villarreal had not worked for the past five days, and he questioned Villarreal's account of how his tarps were stolen, saying that Villarreal's story did not add up:

> As far as when he said he had got his tarps stolen, in his logbook it showed he had been off duty for the past five days. When he told me that he had got his tarps stolen, he had mentioned that it got stolen in Houston, which sort of contradicted what his logbook had said. His logbook showed that he was off—off duty that last week. It really didn't make sense to me. So I believed at that point that he was—he was lying about even having his tarps stolen from him.

Cipriani further explained that he found Villarreal to be unusually nervous. Cipriani described Villarreal as shaking and fidgety, and he could "actually see that carotid artery is pulsating." He explained that "you wouldn't typically see that in somebody who is not highly nervous." Cipriani also felt it was unusual that Villarreal's nervousness didn't subside once he was told he would be receiving a warning. Finally, Cipriani testified that he found it suspicious that Villarreal answered questions without hesitation and with ease, which he believed to be an indication of a "rehearsed story."

4

Roughly twenty minutes into the stop, Cipriani again asked whether Villarreal had any guns, knives, or needles. Villarreal responded that he did not. Cipriani asked whether he had any insulin, prescription medications, or "large amounts of drugs." Villarreal denied that he had anything of that sort in his vehicle. Cipriani then asked Villarreal whether he had "large amounts of heroin, cocaine, methamphetamine, nothing like that, nothing illegal with you? Never been in trouble for anything like that?" Villarreal denied this as well. Finally, Cipriani asked, "Do you give me and my partner consent to search and make sure there's nothing illegal on that trailer, nothing like that?" Villarreal responded, "Yes sir." Cipriani escorted Villarreal into a field on the side of the highway where Villarreal watched as Cipriani and his partner searched the vehicle.

Cipriani used a drill to disassemble the interior of the truck's cab. He testified that some of the interior had been freshly painted.

At some point during the search, Cipriani discovered two long, hidden metal boxes that had been riveted to the bottom of the truck, just below the cab's floor. He testified that the boxes appeared to be freshly painted and did not have any external openings. He knew from inspecting similar vehicles that these boxes were not part of the factory specifications, but must have been an after-market modification, the likes of which he had never seen. He testified that he observed that the boxes were splattered with mud in a sideways and forward pattern, as if "mud was being slung forward," which was inconsistent with how mud spatter from the road should be. He also stated that these boxes would have likely been blocked from mud spatter entirely due to their location above the fuel tank and the wheel well, so the presence of any mud on the boxes was an anomaly. Cipriani testified that the long boxes "looked like the perfect size" for holding

5

several kilograms of drugs. Roughly an hour and forty minutes into the traffic stop, Cipriani drilled "a little hole" in one box and inserted a scope through the hole. He discovered several bundles of drugs. Villarreal was arrested. In all, the boxes contained twenty-seven kilogram-sized bundles of cocaine, which Cipriani testified had a value of about five million dollars.

Following the hearing, the trial court denied suppression and issued the following findings of fact:

1. That the Trooper Cipriani testified truthfully and his testimony was credible;

2. That there existed, at the time of the stop, adequate articulated facts for a prudent officer to believe the defendant violated Section 544.010;

3. That there existed adequate corroboration of the anonymous tipster, at the time of the stop, so that the totality of that information represented adequate articulated facts for a prudent officer to suspect the defendant of engaging in criminal activity;

4. That the defendant voluntarily gave consent to search his truck and belongings without limitations or withdrawal;

5. That there existed justification for prolonging the detention.

Villarreal pleaded guilty and was sentenced to fifty years' confinement. Villarreal appeals.

## II.    STANDARD OF REVIEW

We review a trial judge's ruling on a motion to suppress under a bifurcated standard of review. *Weems v. State*, 493 S.W.3d 574, 577 (Tex. Crim. App. 2016). First, we afford almost total deference to a trial judge's determination of historical facts. *Id.* The judge is the sole trier of fact and judge of witnesses' credibility and the weight to

be given their testimony. *Id.* Second, we review a judge's application of the law to the facts *de novo. Id.* We will sustain the judge's ruling if the record reasonably supports that ruling and is correct on any theory of law applicable to the case. *Id.* The question of whether a specific search or seizure is "reasonable" is a question of substantive Fourth Amendment law that is subject to *de novo* review. *Kothe v. State*, 152 S.W.3d 54, 62 (Tex. Crim. App. 2004).

### III. VALIDITY OF THE INITIAL STOP

By his first issue, Villarreal disputes Cipriani's basis to conduct the traffic stop. Villarreal argues that the transportation code requires the stop line to be clearly marked in order for a traffic violation to occur. *See* TEX. TRANSP. CODE ANN. § 544.010(c). He contends that because the remnants of a stop line were barely visible, if at all, Cipriani could not have reasonably believed that a traffic offense had occurred.

### A. Applicable Law

The Fourth Amendment prohibits unreasonable searches and seizures. *See* U.S. CONST. amend. IV. Fourth Amendment reasonableness is measured in objective terms by examining the totality of the circumstances; it eschews bright-line rules, instead emphasizing the fact-specific nature of the inquiry. *Kothe*, 152 S.W.3d at 63. It requires a balance between the public interest served and the individual's right to be free from arbitrary detentions and intrusions. *Id.*

A court assays the reasonableness of a traffic stop under a two-prong test. *Id.* (citing *Terry v. Ohio*, 392 U.S. 1 (1968)). A court must first decide whether the stop was justified at its inception by a valid basis in reasonable suspicion. *Id.* A police officer has reasonable suspicion to detain if he has specific, articulable facts that, combined with

7

rational inferences from those facts, would lead him reasonably to conclude that the person detained is, has been, or soon will be engaged in criminal activity. *Furr v. State*, 499 S.W.3d 872, 878 (Tex. Crim. App. 2016). In assessing reasonable suspicion, we employ an objective standard that disregards any subjective intent of the officer making the stop and looks solely to whether an objective basis for the stop exists under the totality of the circumstances. *Derichsweiler v. State*, 348 S.W.3d 906, 914 (Tex. Crim. App. 2011). Reasonable suspicion demands "a lesser quantum or quality of information" than the probable cause which would justify an arrest. *Id.* at 916. "It is enough to satisfy the lesser standard of reasonable suspicion that the information is sufficiently detailed and reliable . . . to suggest that something of an apparently criminal nature is brewing." *Wade v. State*, 422 S.W.3d 661, 668 (Tex. Crim. App. 2013).

## B. Analysis

By his first issue, Villarreal challenges the officers' reasonable suspicion to initiate the traffic stop. A person commits a misdemeanor offense if the person fails to perform an act required by the transportation code's "Rules of the Road." TEX. TRANSP. CODE ANN. § 542.301 (West, Westlaw though 2017 1st C.S.). Under the Rules of the Road, the operator of a vehicle approaching an intersection with a stop sign shall stop "as provided by Subsection (c)." *Id.* § 544.010(a). Subsection (c) provides that in "the absence of a crosswalk, the operator shall stop at a *clearly marked* stop line." *Id.* § 544.010(c) (emphasis added). Cipriani stopped Villarreal for violating this rule.

Villarreal contends that the evidence presented by the State shows that the stop line was not "clearly marked," and therefore no traffic violation could have occurred. *See*

8

*id.* As support, he emphasizes certain photographs dated from 2015 which depict a barely visible stop line, with only a few rough strips of white paint visible on the ground.

However, Cipriani testified that at the time of the traffic stop in 2013, the stop line was clearly visible on the road. The court also heard testimony that heavy usage can cause a stop line to disintegrate over time, which explains why the stop line might have appeared different in 2015 than it did in 2013.

By its ruling, the trial court found that the stop line was clearly marked in 2013. *See Wade*, 422 S.W.3d at 668; *Derichsweiler*, 348 S.W.3d at 916. We afford almost total deference to this finding on appeal. *See Weems*, 493 S.W.3d at 577. Deferring to the trial court's finding that the stop line was adequately marked in 2013, we conclude that Villarreal committed a traffic offense by crossing it before stopping, *see* TEX. TRANSP. CODE ANN. § 544.010(c), and that this traffic violation justified Cipriani's decision to initiate a traffic stop under the first prong of *Terry*. *See Kothe*, 152 S.W.3d at 63.

We overrule Villarreal's first issue.

## IV. VALIDITY OF THE CONTINUED DETENTION

By his second issue, Villarreal contends that his protracted detention violates the second prong of *Terry*. Villarreal acknowledges that approximately twenty minutes into the stop, he gave consent to search his vehicle. However, he submits that before he gave consent, the detention had already been unlawfully prolonged beyond the conclusion of its legitimate purposes.

### A. Applicable Law

The second prong of *Terry* asks whether the search and seizure was reasonably related, in scope, to the circumstances that justified the stop in the first place. *Kothe*,

9

152 S.W.3d at 63. A detention may last no longer than is necessary to effectuate the purpose of the stop. *Florida v. Royer*, 460 U.S. 491, 500 (1983); *Kothe*, 152 S.W.3d at 63. "The propriety of the stop's duration is judged by assessing whether the police diligently pursued a means of investigation that was likely to dispel or confirm their suspicions quickly." *Davis v. State*, 947 S.W.2d 240, 245 (Tex. Crim. App. 1997) (en banc). Reasonable suspicion is not a carte blanche for a prolonged detention and investigation. *Matthews v. State*, 431 S.W.3d 596, 603 (Tex. Crim. App. 2014). But the temporary detention may continue for a reasonable period of time until the officers have confirmed or dispelled their suspicion of criminal activity. *Id.*

The United States Supreme Court has rejected rigid time limitations on investigative detentions, instead asking "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Kothe*, 152 S.W.3d at 64; *see United States v. Sharpe*, 470 U.S. 675, 686 (1985) (refusing to establish a bright-line rule that twenty minutes was too long for *Terry* stop). During a traffic stop the officer may request certain information from a driver, such as the driver's license, vehicle registration, and proof of insurance, and run a computer check on that information. *Lerma v. State*, 543 S.W.3d 184, 190 (Tex. Crim. App. 2018). An officer is also permitted to ask drivers and passengers about matters unrelated to the purpose of the stop, so long as the questioning does not measurably extend the duration of the stop. *Id.*

Once a computer check is completed, and the officer knows that the driver has a current valid driver's license, no outstanding warrants, and the car is not stolen, the traffic stop investigation is fully resolved. *Id.* at 191. However, if an officer develops additional

reasonable suspicion that the driver or an occupant of the vehicle is involved in criminal activity, the officer may continue questioning the individual regardless of whether the official tasks of the traffic stop have come to an end. *Id.*

**B.    Analysis**

Cipriani initially stopped Villarreal for a minor traffic violation. Within the first minutes of the encounter, however, Cipriani took note of multiple suspicious circumstances indicating criminal activity that extended far beyond a traffic violation. These circumstances included:

- an investigating agency's report that a vehicle matching the truck's exact description had been flagged at a border patrol checkpoint for possible involvement in narcotics trafficking;

- Villarreal's unusual nervousness;

- Villarreal's seemingly rehearsed story;

- the fact that Villarreal had not had any cargo in nearly a week, but had nonetheless recently departed in the dead of night from a location near the border, heading northward without any cargo;

- the smell of fresh paint emanating from the vehicle, which Cipriani knew to be an indication of hidden compartments and drug trafficking.

Thus, within the first minutes of the stop, Cipriani had several facts within his objective grasp that justified further investigation into the nature of Villarreal's trip. *See Derichsweiler*, 348 S.W.3d at 914.

To that end, Cipriani diligently pursued the permissible lines of inquiry. He probed Villarreal about his trip, asking about his origin, destination, purpose, and other relevant

11

details. While waiting for dispatch to retrieve a report on Villarreal's border crossings, he asked about Villarreal's lack of cargo. To verify his answers, Cipriani spent time consulting Villarreal's logbooks, which the officer had a right to do. *See Kersey v. Wilson*, 69 S.W.3d 794, 798 (Tex. App.—Fort Worth 2002, no pet.) (citing 49 C.F.R. § 395.8(k)(2)). Cipriani quickly frisked Villarreal and inspected the vehicle for safety violations, stating that he anticipated giving Villarreal a warning. Cipriani then directly asked Villarreal about his arrest record and any criminal activity he may have been involved in, such as drug trafficking. Within twenty minutes, he had obtained Villarreal's consent to search his vehicle to check for possible narcotics. We therefore find no merit in Villarreal's complaint about Cipriani's investigation, which was diligent and proportionate to the suspicious circumstances before him. *See Kothe*, 152 S.W.3d at 64.

We overrule Villarreal's second issue.

## V. SCOPE OF CONSENT

By his third issue, Villarreal protests that the search of his vehicle exceeded the scope of his consent. Villarreal contends that his consent did not authorize officers to dismantle the vehicle's interior or to drill holes in the vehicle.

A search conducted pursuant to consent is one of the well-settled exceptions to the Fourth Amendment's warrant requirement. *Carmouche v. State,* 10 S.W.3d 323, 331 (Tex. Crim. App. 2000). However, not all consents are the same, and no consent is irrevocable. *United States v. $304,980.00 in U.S. Currency*, 732 F.3d 812, 819 (7th Cir. 2013) (citing *Florida v. Jimeno,* 500 U.S. 248, 252 (1991)). "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective'

reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Jimeno*, 500 U.S. at 251; *State v. Weaver*, 349 S.W.3d 521, 526 (Tex. Crim. App. 2011). In other words, courts review the totality of the circumstances of a particular police-citizen interaction from the point of view of the objectively reasonable person, without regard for the subjective thoughts or intents of either the officer or the citizen. *Meekins v. State*, 340 S.W.3d 454, 459 (Tex. Crim. App. 2011).

To determine whether the search exceeded the scope of Villarreal's consent, several factors shape our analysis: (1) the scope of the consent given, as defined by the object of the search; (2) whether the search inflicts physical damage on the vehicle or its contents; (3) whether the suspect places any limitation on his consent; (4) whether the suspect objects to the search; and (5) the legitimate utility of the compartment or container invaded. *United States v. Gonzalez-Badillo*, 693 Fed. Appx. 312, 314–15 (5th Cir. 2017), *cert. denied*, 138 S.Ct. 1282 (2018); *United States v. Saucedo*, 688 F.3d 863, 867 (7th Cir. 2012) (utility).

## A.    Disclosure of the Object of the Search and the Extent of Physical Damage

First, the scope of consent is generally defined by its expressed object. *Jimeno*, 500 U.S. at 251; *Valtierra v. State*, 310 S.W.3d 442, 450 (Tex. Crim. App. 2010). If the officer first makes clear that illicit drugs are the object of the search, a reasonable person would know that the suspect has consented to "more than a cursory view of the vehicle," *United States v. Gregoire*, 425 F.3d 872, 880–81 (10th Cir. 2005), for "[c]ontraband goods rarely are strewn across the trunk or floor of a [vehicle]." *Saucedo*, 688 F.3d at 866; *see United States v. Alcantar*, 271 F.3d 731, 738 (8th Cir. 2001) ("[W]hen the police receive

13

consent to search for items that can be hidden in different parts of a car, searching those areas is 'objectively reasonable.'").   Two federal circuits have upheld the use of drills or screwdrivers to break into hidden vehicle compartments based, in part, on the fact that officers made clear that contraband was the express object of the search.   *See Gregoire*, 425 F.3d at 880–81; *United States v. Martel-Martines*, 988 F.2d 855, 858 & n.3 (8th Cir. 1993).   Similarly, the Fifth Circuit has held that consent was not exceeded where an officer ripped a false sole off a shoe, in part because the officer disclosed that he was looking for large quantities of drugs, followed by the suspect's consent.   *See Gonzalez-Badillo*, 693 Fed. Appx. at 315.

But without any disclosure that the object of the search is contraband, a reasonable person could not interpret a general statement of consent to search a vehicle to include the intentional infliction of damage to the vehicle or the property contained within it. *United States v. Ibarra*, 965 F.2d 1354, 1358 (5th Cir. 1992) (en banc) (plurality op.) (quoting *United States v. Strickland,* 902 F.2d 937, 941–42 (11th Cir. 1990)); *United States v. Osage*, 235 F.3d 518, 520 (10th Cir. 2000) (quoting *United States v. Torres,* 32 F.3d 225, 231–32 (7th Cir. 1994)) ("We agree that 'general permission to search does not include permission to inflict intentional damage to the places or things to be searched.'"). Although an individual consenting to a general vehicle search should expect that search to be thorough, he need not anticipate that the search will involve the destruction of his vehicle, its parts, or contents.   *Ibarra*, 965 F.2d at 1358.

Based on these considerations, this Court has held that when an officer "[n]ever indicated the object of the search to appellee" and instead simply obtained consent to "look inside and look around" the detainee's vehicle, this generalized consent did not

14

convey permission to enter the truck with tools to break open hidden compartments. *State v. Gonzalez*, No. 13-02-355-CR, 2004 WL 1698326, at *3 (Tex. App.—Corpus Christi July 29, 2004, no pet.) (mem. op., not designated for publication). Similarly, another Texas court has held that a suspect's permission for an officer to have "a look in his car," without more, would not authorize police to break into a concealed compartment that was welded into the wheel well. *Cardenas v. State*, 857 S.W.2d 707, 711 (Tex. App.—Houston [14th Dist.] 1993, pet. ref'd).

Here, however, Cipriani made clear that the object of his search was "large amounts of heroin, cocaine, methamphetamine . . . ." *See id.*; *Gonzalez*, 2004 WL 1698326, at *3. Villarreal then agreed to the search. Villarreal thus consented to a more incisive search than that which was justified by the vague grant of consent in *Gonzalez* and *Cardenas*. Instead, Villarreal's broad consent to search for large amounts of contraband favors the conclusion that the officers did not exceed the permissible scope of Villarreal's consent. *See Gonzalez-Badillo*, 693 Fed. Appx. at 315; *Gregoire*, 425 F.3d at 880–81; *Martel-Martines*, 988 F.2d at 858 & n.3.

## B.    Suspect's Express Limitation or Objection to Scope of Search

"[C]ourts can look at the defendant's conduct to help determine the scope of a consensual search." *Gonzalez-Badillo*, 693 Fed. Appx. at 315. It is well established that a criminal suspect may limit the scope of consent to a search, but the burden is on him to do so. *United States v. Thurman*, 889 F.3d 356, 367–68 (7th Cir. 2018); *see Weaver*, 349 S.W.3d at 526.

Moreover, if there is evidence that a defendant is in a position to object to the search, a failure to object to the breadth of the search is properly considered an indication

15

that the search was within the scope of the initial consent. *See Gonzalez-Badillo*, 693 Fed. Appx. at 315; *United States v. Jones*, 356 F.3d 529, 534 (4th Cir. 2004); *Martel-Martines*, 988 F.2d at 858 ("At the garage, he watched in silence as the officers examined the truck on a hoist, lowered it, and prepared to puncture the sheetmetal that covered the secret compartment."). A person's silence in the face of an officer's further actions may imply consent to that further action. *Weaver*, 349 S.W.3d at 526.

Here, it is undisputed that Villarreal placed no limitations on the scope of the search. There was evidence that Villarreal watched the entirety of the search from a distance of forty paces. Villarreal's relative proximity to the officers put him in a position to object to the scope of the search, yet even as an hour passed, he did not object to Cipriani's actions. Villarreal's failure to place limitations or object is at least some indication that the officers did not exceed the scope of his consent. *See Gonzalez-Badillo*, 693 Fed. Appx. at 315.

## C. Utility of the Compartment Invaded

Finally, some courts have considered whether the container or compartment invaded is legitimately part of the vehicle or whether it has any usefulness other than to conceal contraband. In *Cardenas*, police observed a compartment that was welded into the wheel well of the suspect's automobile. 857 S.W.2d at 709. The court approved officers' use of tools to break the weld and access this compartment as within the scope of the suspect's written consent to search the vehicle, in part because the compartment had no legitimate use as part of the vehicle. *Id.* at 712. Breaking into the compartment, the court reasoned, did no damage to "the basic structural assembly" of the vehicle. *Id.*

16

Instead, the welded compartment was merely an "artificial barrier to a standard compartment of the car, the tire well." *Id.*

Similarly, in *Saucedo*, the Seventh Circuit found it significant that the hidden compartment invaded was not a "functional part of the tractor." 688 F.3d at 867. Instead, "the compartment had no function other than to conceal drugs . . . ." *Id.* This was compared to a door panel, the destruction of which would impair the "legitimate function" of the vehicle. *Id.*

Here, the two boxes in which the drugs were discovered were riveted to the bottom of the vehicle, concealed between the cab and the wheels. The boxes were freshly painted, artfully splattered with mud, and sealed from all sides. They were not part of factory specifications. Rather, the boxes were add-ons with no apparent utility except to help Villarreal covertly transport a large amount of drugs. When Cipriani drilled a small hole into one of the false compartments, he did little or no damage to the authentic form of the vehicle itself. This, too, favors the conclusion that Cipriani did not exceed the legitimate scope of Villarreal's consent.

**D.     Summary**

Villarreal gave Cipriani blanket permission to search the vehicle for large amounts of drugs, which provided Cipriani with authority to thoroughly search the vehicle. *See Gonzalez-Badillo*, 693 Fed. Appx. at 315. Villarreal placed no limitations on the scope of his consent and never objected to the search, even as he watched Cipriani explore various parts of the vehicle for over an hour. *See Thurman*, 889 F.3d at 367–68. During the search, Cipriani happened upon the hidden, completely sealed boxes affixed to the bottom of the cab, which had no apparent utility other than to conceal contraband. *See*

17

*Saucedo*, 688 F.3d at 867. He drilled into these false attachments, doing little or no damage to the vehicle itself. *See Cardenas*, 857 S.W.2d at 712. Based the totality of these circumstances, *see Meekins*, 340 S.W.3d at 459, the trial court correctly concluded that Cipriani did not exceed the scope of Villarreal's consent. *See Weems*, 493 S.W.3d at 577.

We overrule Villarreal's third issue.

## VI. CONCLUSION

We affirm the judgment of the trial court.

NELDA V. RODRIGUEZ
Justice

Publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the 27th
day of December, 2018.

18