Filed 8/28/20  P. v. Lopez CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

<table>
<tr><td>

THE PEOPLE,

    Plaintiff and Respondent,

v.

RAYMUNDO LOPEZ,

    Defendant and Appellant.

</td><td>

D075604

(Super. Ct. No. SCS294826)

</td></tr>
</table>

APPEAL from a judgment of the Superior Court of San Diego County, Ana España, Theodore M. Weathers, and Patricia Garcia, Judges.  Affirmed.

Robert F. Somers, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Meredith S. White and Robin Urbanski, Deputy Attorneys General, for Plaintiff and Respondent.

Members of a Border Patrol task force surveilled defendant Raymundo Lopez after he crossed into the United States from Mexico in his SUV in the middle of the night. After seeing Lopez make several "countersurveillance" driving maneuvers, and fearing he was about to return to Mexico to avoid being detained, the agents initiated a traffic stop. Lopez consented to a canine sniff and a search of his vehicle. After the canine alerted to the driver's front wheel well area, an agent examined the area and observed that drain holes in the vehicle's undercarriage had been covered, and there were other fresh tool markings suggesting the presence of a hidden compartment. The agent drilled into the suspected compartment and observed a white powdery substance on his drill bit when he withdrew it. A subsequent, more elaborate search of Lopez's vehicle revealed 15 kilograms of cocaine concealed in the hidden compartment.

A jury found Lopez guilty of transportation of cocaine for sale and possession of cocaine for sale, and found true as to both counts that the amount of cocaine exceeded 10 kilograms. The trial court imposed a 13-year split sentence and ordered Lopez to pay assessments, fees, and fines totaling about $5,000.

Lopez raises several challenges on appeal. First, he contends the trial court erred by denying his suppression motion. He maintains the agents lacked reasonable suspicion to initiate the traffic stop in the first instance, and then exceeded the scope of his consent to search by drilling into his vehicle without a warrant. Second, he contends the trial court erred by denying his motion for mistrial after an agent testified on cross-examination that one of the reasons he initially detained Lopez was that Lopez's vehicle, or a similar type of vehicle, had been involved in a prior drug bust. Alternatively, Lopez contends his counsel performed ineffectively by eliciting

2

this testimony from the agent.  Finally, Lopez contends the trial court erred by imposing monetary assessments he will not be able to pay because he will likely be deported to Mexico when he is released from custody.

For reasons we will explain, Lopez's contentions lack merit. Accordingly, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### *Prosecution Evidence*

At about 1:50 a.m. on July 11, 2017, Lopez and his 14-year-old daughter crossed into the United States from Mexico in Lopez's 2009 Saturn Outlook SUV.  Six U.S. Border Patrol agents assigned to the Predictive Intelligence Targeting Team were conducting surveillance at the port of entry and began following Lopez in their unmarked vehicles.

The agents observed Lopez engage in several driving maneuvers they interpreted as countersurveillance measures designed to determine whether Lopez was being followed.  After surveilling Lopez for about 40 minutes, the agents decided to detain him as he entered a southbound freeway onramp.

Agent Ronaldo Aldaco—a fully uniformed agent and canine handler— initiated the traffic stop.  Aldaco observed that Lopez appeared nervous—he was shaking, avoiding eye contact, and sweating even though it was cold outside.  Lopez told the agent he was coming from his family's house and heading to Tijuana for a funeral.

When Aldaco asked if he could conduct an exterior canine sniff and a search of the vehicle, Lopez consented.  During the ensuing canine sniff, Aldaco's canine alerted to the driver's "fender well area."  Aldaco visually inspected the area and the vehicle's undercarriage and saw that the drain holes in the frame rails had been covered.  Aldaco explained that all vehicles are built on a frame (consisting of hollow rails that run the length of the

3

vehicle), which serves as the vehicle's foundation. The frame rails have drain holes to allow fluids from the engine to drain out. Aldaco also saw excessive tool markings on bolts attached to the vehicle's frame and fender. The tool markings appeared to have been concealed with "spray-on-dirt." Based on his training and experience, Aldaco suspected an aftermarket compartment was concealed in the frame rails.

Aldaco retrieved a drill from his truck and drilled into the suspected hidden compartment. When he removed the drill bit, he saw a white powdery substance on the bit that appeared to be cocaine or heroin. Aldaco arrested Lopez and transported the Saturn to the nearest Border Patrol station.

There, Aldaco dismantled the front end of the vehicle and discovered 15 kilogram-sized packages of suspected narcotics concealed in the frame rails. Subsequent testing confirmed the packages contained 15 kilograms of cocaine, worth approximately $315,000. Based on the characteristics of the hidden compartment, Aldaco estimated it would have taken two to four days to construct.

A Homeland Security Investigations special agent with expertise in narcotics cases opined that in a hypothetical situation mirroring the facts of this case, the driver's "behavior would be very consistent with a knowing courier" of narcotics. The agent further testified the pattern of Lopez's border crossings was inconsistent with that of an "unknowing courier."

### Defense Evidence

Lopez testified he was unaware of the cocaine's presence in his vehicle. He said he had purchased the used Saturn in Tijuana about a year and a half ago, and denied knowing it had any hidden compartments (despite his having replaced the transmission himself). Lopez specifically denied knowingly bringing drugs into the U.S. at any time.

4

### Prosecution Rebuttal

A detective who interviewed Lopez after his arrest testified in rebuttal that Lopez "changed his reasoning" two or three times regarding why he had crossed the border that night.

### Jury Verdicts and Sentence

At a first trial, the jury was unable to reach verdicts and the trial court declared a mistrial. The court's minute order indicates jurors were unable to agree whether Lopez knew of the cocaine's presence in his vehicle.

At the second trial, the jury found Lopez guilty of transportation of cocaine for sale (Health & Saf. Code, § 11352, subd. (a)) and possession of cocaine for sale (*id.*, § 11351). As to both counts, the jury found that the weight of the cocaine exceeded 10 kilograms. (*Id.*, § 11370.4, subd. (a)(3) ["Where the substance exceeds 10 kilograms by weight, the person shall receive an additional term of 10 years."].)

The trial court imposed a 13-year split sentence on the transportation-for-sale conviction (to be served six years in custody and seven years under mandatory community supervision). The court imposed, but stayed under section 654, an aggregate 12-year sentence on the possession-for-sale conviction.

The court also ordered Lopez to pay $5,014 in assessments, consisting of the following: a $3,900 restitution fine (Pen. Code,[1] § 1202.4, subd. (b));[2] an $80 court security fee (§ 1465.8); a $60 criminal conviction assessment (Gov. Code, § 70373); a $154 criminal justice administration fee (Gov. Code,

---

[1] Further undesignated statutory references are to the Penal Code.

[2] The trial court also imposed, but stayed, a corresponding $3,900 supervision-revocation fine under section 1202.45.

§ 29550 et seq.); a $615 drug program fee (Health & Saf. Code, § 11372.7); and a $205 lab analysis fee (Health & Saf. Code, § 11372.5).

## DISCUSSION

### I. *No Error in Denying Suppression Motion*

Lopez contends the trial court erred by denying his motion (and renewed motion) to suppress all evidence because the agents unlawfully detained him without reasonable suspicion and then conducted an unreasonable warrantless search by drilling into his vehicle. We disagree.

### A. *Background*

Before the preliminary hearing, Lopez moved to suppress all evidence against him on the basis that Agent Aldaco lacked reasonable suspicion for the traffic stop. (§ 1538.5.) The prosecution opposed the motion, arguing Aldaco had reasonable suspicion because the agents knew Lopez was connected to a significant drug bust about one month earlier, and Lopez engaged in countersurveillance driving maneuvers. The prosecution further argued Lopez voluntarily consented to the search of his vehicle.

### 1. *Suppression Hearing*

The hearing on Lopez's suppression motion coincided with the preliminary hearing. Border Patrol Agents Andrew Beltran and Rolando Aldaco testified at the hearing.

### (a) *Agent Beltran*

Beltran testified about the facts leading up to the traffic stop. Beltran was a member of the Border Patrol's Predictive Intelligence Targeting Team, which "look[s] for travel patterns that are consistent with . . . narcotics" and other "smuggling" offenses. Typically, the team identifies vehicles used to transport narcotics across the border, then investigates everyone associated with that vehicle. The team became aware of Lopez about one month before

6

his arrest because his "vehicle was associated with an[] ongoing drug investigation" and "there was some sort of connection with [Lopez] in another case."

The team worked special hours on July 11 in anticipation of Lopez crossing the border. Six team members in unmarked vehicles began surveilling Lopez as he crossed the San Ysidro port of entry in his Saturn at about 1:50 a.m.

After driving north on Interstate 805 for a few miles, Lopez exited the freeway and went to a gas station. Beltran followed him and pretended to pump gas. Lopez and a teenage female were the only occupants in the Saturn. Beltran observed that as Lopez walked to and from the gas station store, he "glanced everywhere" in a way Beltran characterized, based on his experience, as "not normal" and likely "looking out for . . . law enforcement."

After the gas station, Lopez got back on northbound Interstate 805. Lopez then engaged in several driving maneuvers Beltran characterized as countersurveillance measures. First, Lopez drove only about 55 miles per hour on the freeway, whereas the flow of traffic was about 80 miles per hour. Second, Lopez exited the freeway and waited at the offramp traffic signal for about five seconds after the light had turned green. Third, Lopez made an abrupt, last-minute right turn from the far-left lane, and then stopped mid-block partially in the traffic lane. Fourth, Lopez accelerated and decelerated erratically. Finally, Lopez kept "just making turn after turn" and eventually eluded the agents for a few minutes, before parking his car on a residential street and turning off the vehicle's lights.

The agents eventually located the Saturn, confirmed there were still two occupants, and took up surveillance positions on neighboring streets. The Saturn drove off about 10 or 15 minutes later, and the team followed.

7

When the Saturn continued with "the same type of driving behavior" as before and headed toward the onramp to southbound Interstate 805, Beltran believed the team's cover had been blown and decided to stop the Saturn before it fled to Mexico. Aldaco initiated the traffic stop because he was the only agent in full uniform.

The agents determined Lopez was driving, and the female passenger was his 14-year-old daughter. When Beltran asked the daughter where they were coming from, she gave several different explanations and "just continued to fumble with her words and tr[ied] to make up stories."

### (b) *Agent Aldaco*

Agent Aldaco testified about his role in the traffic stop and search. He had been monitoring the team's radio traffic about Lopez's countersurveillance techniques and responded to the location where the Saturn had been parked with its lights off. Aldaco also observed Lopez drive erratically from the residential street to the southbound freeway onramp.

Aldaco testified he initiated the traffic stop based on Lopez's countersurveillance maneuvers and because Aldaco knew Lopez "was linked to another [narcotics] seizure that [Aldaco] was involved in [with] the same type of vehicle, in the same type of compartment," which is why the agents were surveilling Lopez in the first place. Aldaco further testified he had "extensive experience in after-market compartments," including those concealed in the frames of Saturn Outlooks and their variants.

Aldaco approached the Saturn, identified himself as a Border Patrol agent, and asked Lopez about his immigration status. Lopez "said he was a permanent resident cardholder." Aldaco asked Lopez to step out of the vehicle for a safety pat-down, and Lopez complied. Aldaco did not find any weapons or drugs on Lopez.

8

When Aldaco asked Lopez where he was coming from, Lopez "stated that he was coming from a family member's house nearby and was heading to a funeral in Tijuana, Mexico." Aldaco noticed that Lopez's "voice was cracking," and Lopez "was fidgeting," acting "nervous," and "sweating a lot even though the weather was cool."[3]

Aldaco asked Lopez "for . . . consent to conduct a K-9 sniff and a search [of] the vehicle." Lopez responded, "Yes, go ahead, you can . . . deploy the K-9 and you can also search the vehicle as well." During the ensuing search, the trained and certified canine "specifically alerted to the driver's front wheel well area."

Aldaco then conducted a visual inspection of the Saturn's undercarriage. He "noticed that the drain holes to the frame rails[4]were covered with . . . sheet metal" and "spray painted . . . to mimic the factory paint," which, in his experience, was "consistent with an after-market compartment." Aldaco further suspected the presence of a hidden compartment because there were "recent tooling marks" on all the bolts and clips in the fender area from which one accesses the frame rails. The tooling marks were covered with "spray-on dirt."

Aldaco went to his truck and retrieved a drill. He testified as follows about what happened next:

> "I used my drill to drill a hole. First I had to turn the tire, the steering wheel, I turned it to the left so it gave me room enough to . . . place my drill and start drilling the frame

---

3    Agent Beltran also testified that Lopez appeared "very nervous."

4    Similar to his trial testimony, Aldaco testified that "frame rails" "are support frames that support the vehicle that run across the back to front." They have drain holes "so that water [and engine fluids] can flow to the ground and not stay in the car."

rail through the plastic. [¶] And after retreating the drill bit, I noticed a white powdery substance that is consistent in my experience with characteristics of cocaine."

Aldaco relayed his findings to the team and arrested Lopez for possible possession of a controlled substance. The agents took the Saturn to the nearest Border Patrol station, where Aldaco dismantled the front end and discovered 15 kilogram-sized "bricks" of cocaine in the frame rails.

### (c) *Ruling*

After hearing testimony, the trial court heard argument on the suppression motion. The prosecutor argued the agents had reasonable suspicion to initiate the traffic stop based on their "prior information" about Lopez's narcotics activity and his extensive countersurveillance maneuvers. The prosecutor added that Lopez had expressly consented to the search of his vehicle.

Defense counsel argued the perceived countersurveillance measures were insufficient to establish reasonable suspicion for the traffic stop; he did not address the agents' prior intelligence about Lopez. Counsel further argued Lopez's consent did not extend to drilling into his vehicle because "no one could foresee" that a consensual search would damage his vehicle. Counsel maintained the agents should have obtained a search warrant before drilling because there were no exigent circumstances.

In rebuttal, the prosecutor argued the canine alert provided probable cause for a further search, and, thus, no warrant was required under the automobile exception to the warrant requirement.

Based on "the totality of all the circumstances," the trial court denied the suppression motion. The court found the agents had reasonable suspicion for the traffic stop based on their knowledge of some connection between Lopez or his vehicle and prior trafficking activity; Lopez's "furtive gestures"

10

at the gas station; the time of day ("essentially middle of the night"); and Lopez's countersurveillance measures.

The court did not initially address the drilling issue, but when defense counsel raised it, the court stated it agreed that the canine alert provided probable cause for a further search, which, under the automobile exception, did not require a warrant.

### (d) *Renewed Suppression Motion*

A few months later, Lopez filed a renewed suppression motion rearguing that drilling into the frame rails exceeded the scope of consent, and did not fall within the automobile exception because there was no exigency or danger to the agents. (§ 1538.5, subd. (i).)[5]

The prosecutor countered that the agents had developed probable cause before Aldaco used his drill and, thus, no warrant was required under the automobile exception. As to the scope of consent, the prosecutor argued "there [were] no limitations placed on it." However, the prosecutor acknowledged Lopez probably had not contemplated that Aldaco would drill into the frame rails.

Defense counsel did not dispute that the agents had probable cause, but maintained the "automobile exception is not carte blanche" to conduct a warrantless search "absent an exigent circumstance."

The trial court denied the renewed suppression motion. First, the court found "there was probable cause to search" the frame rails. Second, the court

---

5    Lopez based his renewed suppression motion on the evidentiary record developed at the preliminary hearing. (See § 1538.5, subd. (i); *People v. Bennett* (1998) 68 Cal.App.4th 396, 405 [where initial suppression motion is made at preliminary hearing, renewed suppression motion is generally limited to the preliminary hearing transcript].)

11

found "there appeared to be consent given," including "that once the officer brought out the drill, [Lopez] never objected to it . . . ."

## B. *Standard of Review*

" 'In reviewing a suppression ruling, "we defer to the superior court's express and implied factual findings if they are supported by substantial evidence, [but] we exercise our independent judgment in determining the legality of a search on the facts so found." ' " (*People v. Tully* (2012) 54 Cal.4th 952, 979 (*Tully*).) "Thus, while we ultimately exercise our independent judgment to determine the constitutional propriety of a search or seizure, we do so within the context of historical facts determined by the trial court. 'As the finder of fact . . . the superior court is vested with the power to judge the credibility of the witnesses, resolve any conflicts in the testimony, weigh the evidence and draw factual inferences in deciding whether a search is constitutionally unreasonable.' [Citation.] We review its factual findings ' " 'under the deferential substantial-evidence standard.' " ' [Citation.] Accordingly, '[w]e view the evidence in a light most favorable to the order denying the motion to suppress' [citation], and '[a]ny conflicts in the evidence are resolved in favor of the superior court ruling' [citation]. Moreover, the reviewing court 'must accept the trial court's resolution of disputed facts and its assessment of credibility.' " (*Ibid.*)

## C. *Analysis*

### 1. *The Agents Had Reasonable Suspicion for the Traffic Stop*

A law enforcement officer may detain a motorist for a brief investigation when the totality of the circumstances provide the officer with reasonable suspicion that the motorist has violated the law. (*Navarette v. California* (2014) 572 U.S. 393, 396; see *People v. Wells* (2006) 38 Cal.4th 1078, 1082.) Lopez contends the agents lacked reasonable suspicion to detain

him because, although countersurveillance measures can *contribute to* reasonable suspicion, they are insufficient *standing alone*, and there was no "evidence *other than* perceived countersurveillance driving techniques" to support the agents' belief that Lopez was involved in criminal activity. (Italics added.) We disagree.

As Lopez acknowledges, perceived countersurveillance driving techniques can contribute to a finding of reasonable suspicion. (See, e.g., *People v. Gomez* (2004) 117 Cal.App.4th 531, 538.) And Agent Beltran testified he observed Lopez use multiple countersurveillance measures: driving slowly on the freeway; pausing at a green light; making an abrupt right turn from the far-left lane, and then immediately stopping mid-block while partially in the traffic lane; and erratically accelerating and decelerating.

Contrary to Lopez's assertion, there was, indeed, additional evidence indicating he was engaged in criminal activity First, Beltran testified that his team's investigative techniques indicated Lopez and his vehicle were connected to narcotics activity.[6] Second, Beltran testified that Lopez's "glancing" at the gas station was "not normal" and appeared to be "looking

---

[6] Lopez argues tangentially that his act of crossing the border was not, itself, "suspicious because this act was routine" for him, as evidenced by the special agent's trial testimony about Lopez's frequent border crossings. This argument fails because it is based on *trial* testimony. "[I]n reviewing the trial court's suppression ruling, we consider only the evidence that was presented to the trial court at the time it ruled." (*In re Arturo D.* (2002) 27 Cal.4th 60, 77, fn. 18 (*In re Arturo D.*); see *People v. Moore* (2006) 39 Cal.4th 168, 171 (*Moore*) [review of ruling on suppression motion limited to record of suppression hearings].) Moreover, the special agent testified Lopez's border crossing patterns were inconsistent with those of an unknowing courier.

out for . . . law enforcement." Finally, Aldaco testified to his experience locating hidden narcotics compartments in vehicles like Lopez's.

Thus, based on our independent review of the totality of these circumstances, we conclude the agents had reasonable suspicion to detain Lopez.

## 2. *Consent and the Automobile Exception Justified the Drill Search*

Lopez contends the warrantless search of his vehicle by drilling into its frame rail violated his Fourth Amendment rights because the destructive drilling exceeded the scope of his consent and was not justified by the automobile exception. We disagree.

Preliminarily, we note Lopez's contentions are based on a flawed factual assumption—that Aldaco drilled directly into the frame rail, itself. He bases this on Aldaco's *trial* testimony that he "had to turn the wheel to the left side so it could give [him] a space *to drill the frame rail* from the side." (Italics added.) However, as already noted, in reviewing a ruling on a suppression motion, we consider only the record before the trial court at the time of its ruling. (*In re Arturo D.*, *supra*, 27 Cal.4th at p. 77, fn. 18; *Moore*, *supra*, 39 Cal.4th at p. 171.) Thus, we are limited to Aldaco's preliminary hearing testimony that he "start[ed] drilling the frame rail *through the plastic*" (italics added), though he also referred to the covering material during the preliminary hearing as "sheet metal." In either event, we agree with the Attorney General that "the most reasonable interpretation of [this] testimony is that [Aldaco] drilled through where the drain hole would have been, into material . . . that comprised the hidden compartment." We will analyze Lopez's challenge with this understanding.

14

## (a) *Relevant Legal Principles*

Warrantless searches " ' "are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." ' [Citations.] 'The burden is on the People to establish an exception applies.' [Citation.]" (*People v. Ovieda* (2019) 7 Cal.5th 1034, 1041.)

One "well settled" and "specifically established exception[] . . . is a search that is conducted pursuant to consent." (*Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 219; see *Florida v. Jimeno* (1991) 500 U.S. 248, 251 (*Jimeno*); *People v. Superior Court (Chapman)* (2012) 204 Cal.App.4th 1004, 1012.) " 'The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of "objective" reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect? [Citations.]' " (*People v. Crenshaw* (1992) 9 Cal.App.4th 1403, 1408 (*Crenshaw*).) "A consensual search may not legally exceed the scope of the consent supporting it." (*Ibid.*) " 'Whether the search remained within the boundaries of the consent is a question of fact to be determined from the totality of [the] circumstances. [Citation.] Unless clearly erroneous, we uphold the trial court's determination.' " (*Tully, supra,* 54 Cal.4th at pp. 983-984.)

Another exception to the Fourth Amendment's warrant requirement is the automobile exception. "Under the automobile exception, police who have probable cause to believe a lawfully stopped vehicle contains evidence of criminal activity or contraband may conduct a warrantless search of any area of the vehicle in which the evidence might be found. [Citations.] Such a search 'is not unreasonable if based on facts that would justify the issuance of a warrant, even though a warrant has not actually been obtained.' " (*People*

15

*v. Evans* (2011) 200 Cal.App.4th 735, 753 (*Evans*), quoting *United States v. Ross* (1982) 456 U.S. 798, 809 (*Ross*).)

"The scope of a warrantless search based on probable cause [under the automobile exception] is no narrower—and no broader—than the scope of a search authorized by a warrant supported by probable cause.  Only the prior approval of the magistrate is waived; the search otherwise is as the magistrate could authorize." (*Ross, supra,* 456 U.S. at p. 823; see *Evans, supra,* 200 Cal.App.4th at p. 753.)  Thus, police "may conduct a search of the vehicle that is as thorough as a magistrate could authorize in a warrant . . . ." (*Ross,* at p. 800; see *Evans,* at p. 753.)

Under "established precedent, the 'automobile exception' has no separate exigency requirement." (*Maryland v. Dyson* (1999) 527 U.S. 465, 466; see *People v. Waxler* (2014) 224 Cal.App.4th 712, 725; *People v. Johnson* (2018) 21 Cal.App.5th 1026, 1034.)  " 'If a car is *readily mobile* and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more.' " (*Dyson,* at p. 467, italics added; see *Waxler,* at p. 725.)  A vehicle is "readily mobile" if it is operative—it does not " 'depend upon . . . the likelihood . . . that the car would have been driven away, or that its contents would have been tampered with, during the period required for the police to obtain a warrant.' " (*People v. Superior Court (Overland)* (1988) 203 Cal.App.3d 1114, 1119 (*Overland*); see *California v. Carney* (1985) 471 U.S. 386, 392-393 [a "vehicle is obviously readily mobile" if it "is being used on the highways, or if it is readily capable of such use"].)

### (b) *Analysis*

In addressing the scope of consent, the parties primarily discuss *Crenshaw, supra,* 9 Cal.App.4th 1403, in which the Court of Appeal concluded the defendant's consent to a search of his vehicle for drugs

16

extended to a police officer using a screwdriver to unscrew and remove a vent cover on the vehicle's door post, where the officer ultimately found drugs. (*Id.* at pp. 1407-1408, 1415.) The court found the search was within the scope of consent because (1) the suspect knew the officer was searching for drugs and, thus, should have expected a "thorough" search; (2) the officer's experience led him to believe drugs might be concealed behind the suspicious vent cover; (3) the door vent was not "mutilated, rendered useless or otherwise damaged during the process of removal"; and (4) "[a]lthough seated a short distance away in a police vehicle . . . at the time the panel was removed, there [was] no indication in the record [the defendant] ever expressly or impliedly made any attempt to limit the scope of the search as it progressed . . . ." (*Id.* at p. 1415.)

The *Crenshaw* court based its holding on *Jimeno*, *supra*, 500 U.S. 248 and its progeny. (*Crenshaw*, *supra*, 9 Cal.App.4th at p. 1414.) In *Jimeno*, the Supreme Court held that consent to a vehicle search for drugs "included consent to search containers within that car which might bear drugs" because "[a] reasonable person may be expected to know that narcotics are generally carried in some form of a container." (*Jimeno*, at p. 251; see *Ross*, *supra*, 456 U.S. at p. 820 ["Contraband goods rarely are strewn across the trunk or floor of a car . . . ."].) The court concluded the consent reasonably extended to the police officer's search of a closed paper bag on the vehicle's floorboard. (*Jimeno*, at pp. 250, 252.) In reaching this conclusion, the *Jimeno* court distinguished a Florida case in which "the Supreme Court of Florida held that consent to search the trunk of a car did not include authorization to pry open a locked briefcase found inside the trunk. It is very likely unreasonable to think that a suspect, by consenting to the search of his trunk, has agreed to the breaking open of a locked briefcase within the trunk, but it is otherwise

17

with respect to a closed paper bag." (*Id.* at pp. 251-252, citing *State v. Wells* (Fla. 1989) 539 So.2d 464.)

Based on our determination that Aldaco drilled through the drain hole covering and not the frame rail itself, we conclude under the reasoning of *Crenshaw* and *Jimeno* that the drill search was within the scope of Lopez's consent.[7]  First, Lopez should reasonably have inferred from Aldaco's request for consent to a canine sniff that Aldaco intended to search for drugs and, thus, Lopez was consenting to a "thorough" search. (*Crenshaw*, *supra*, 9 Cal.App.4th at p. 1415.)  Second, Aldaco testified about his experience with drug traffickers concealing drugs in vehicles' frame rails. (See *ibid.* [officer experience].)  Third, drilling into the drain hole cover did not "mutilate[], render[] useless or otherwise damage[]" Lopez's vehicle. (*Ibid.*)  Finally, although the record is silent as to Lopez's whereabouts when Aldaco retrieved the drill from his truck and began using it on Lopez's vehicle, as in *Crenshaw*, "there is no indication in the record [Lopez] ever expressly or impliedly made any attempt to limit the scope of the search as it progressed . . . ." (*Ibid.*) Thus, the search was within the scope of Lopez's consent.

We likewise conclude the search was justified under the automobile exception because Lopez's vehicle was readily mobile and Aldaco developed probable cause to believe drugs were concealed in the frame rail.

Lopez does not dispute that his vehicle was readily mobile.  Nor could he—the record shows it was operative immediately before the traffic stop.

Nor does Lopez seriously dispute that Aldaco had probable cause. Indeed, Lopez expressly acknowledges that "[a] dog alert can provide . . .

---

7     We express no opinion as to whether the search would have exceeded the scope of Lopez's consent had Aldaco drilled into the frame rail itself.

18

probable cause . . . ." (*People v. Bautista* (2004) 115 Cal.App.4th 229, 236.) Instead, Lopez questions "whether a magistrate would have issued a warrant . . . absent the drill search." We have little doubt on the record before us that a magistrate would have done so.

Had the agents sought a search warrant prior to conducting the drill search, the evidentiary showing would have included the following: the agents' knowledge of Lopez's and his vehicle's connection to prior drug trafficking activity; Lopez's "not normal" behavior at the gas station; his use of numerous countersurveillance driving maneuvers; his nervous demeanor during the traffic stop; his and his daughter's misleading explanations about their travel plans; the positive canine alert; Aldaco's observations of the alterations to the frame rail drain holes; and Aldaco's observations about fresh tooling marks and spray-on-dirt on the front fender. On this evidentiary showing, a magistrate most certainly would have issued a search warrant authorizing the agents to drill through the material covering the frame rail drain holes. Indeed, a magistrate would also likely have authorized the agents to drill through the frame rail itself.

Lopez's only other challenge to the applicability of the automobile exception is his assertion that law enforcement officers should not be making probable cause determinations "in the stress of [the] moment"—the determination should instead be made by a dispassionate magistrate. But the whole point of the automobile exception is to allow officers to conduct vehicle searches based on roadside probable cause determinations. (*Ross*, *supra*, 456 U.S. at p. 823 ["prior approval of the magistrate is waived"].) Moreover, contrary to Lopez's suggestion, the fact that "there was no risk of the vehicle being stolen or the evidence being lost" does not render the automobile exception inapplicable. (See *Overland*, *supra*, 203 Cal.App.3d at

19

p. 1120 ["[T]he fact that defendant was under arrest and had no immediate access to his truck is immaterial in determining the validity of the search."].)

Our conclusions regarding the scope of consent and the automobile exception are consistent with those reached by courts in other jurisdictions, which we discovered through our own independent research. In nearly all of those cases, the courts upheld the drill search as falling within the scope of the driver's consent,[8] the automobile exception,[9] or both.[10] We found only

---

8    (See *United States v. Gregoire* (10th Cir. 2005) 425 F.3d 872, 875, 880-881 [driver's consent extended to "drill[ing] two small holes in the floor" and "chipp[ing] away some undercoat . . . of the compartment" because the trooper told the driver he was searching for drugs and a hidden compartment, and the driver did not object during the search]; *Villarreal v. State* (Tex.Ct.App. 2018) 565 S.W.3d 919, 925, 930-931 [driver's consent extended to officer "drill[ing] 'a little hole' " into a "hidden metal box[]" underneath truck cab—the driver knew the object of the search was " 'large amounts of' " narcotics, the driver did not object during the search, and the drilled compartments "were add-ons with no apparent [legitimate] utility" and, thus, drilling into them "did little or no damage to the authentic form of the vehicle itself"].)

9    (See *United States v. Zamora-Garcia* (8th Cir. 2016) 831 F.3d 979, 982-984 [although consent did "not give law enforcement officers license to destroy [his] property" by drilling through the trunk floor, probable cause had developed during the consensual search, which justified the drilling under the automobile exception]; *Fernandez v. State* (Ga.Ct.App. 2005) 619 S.E.2d 821, 829 [drilling through vehicle floorboard]; *United States v. Guevara* (D.Neb., Feb. 21, 2012, No. 8:11CR135) 2012 WL 553356, at pp. *5-*7 [drilling through nonfactory sheet metal inside engine component]; *United States v. Martin* (D.Kan., Dec. 6, 2019, No. 18-CR-40117-HLT) 2019 WL 6682990, at pp. *2-*3 [drilling into metal tubes in truck bed]; *United States v. Nunez-Daza* (S.D.N.Y., Aug. 8, 2000, No. 99 CR. 291 (LMM)) 2000 WL 1119099, at p. *4 [although "a general consent would not necessarily support [a] deputy's use of a drill," probable cause that developed during the consensual search justified drilling into the vehicle's raised floor].)

10    (See *United States v. Ahumada* (D.Kan., Feb. 18, 2015, No. 14-40088-

one case in which an appellate court invalidated a drill search on the basis it exceeded the scope of consent, but that court did not address the automobile exception because it had not been raised in the trial court. (*State v. Garcia* (N.M.Ct.App. 1999) 986 P.2d 491, 492, 495.) Notably, in the strikingly analogous case of *United States v. Rodriguez-Quiros* (9th Cir. 2011) 442 Fed.Appx. 347, the Ninth Circuit upheld a warrantless drill search into a vehicle's frame rails where officers observed plugged drain holes, fresh tool marks on the bumper, and fresh markings on the bolts that secure the frame rail end caps.[11]

To summarize, because the record before the trial court at the time of the suppression rulings shows Aldaco drilled through the material covering the frame rail drain holes (and not the frame rail itself), the search fell within the scope of Lopez's consent to search his vehicle. Additionally, the automobile exception justified the search because the agents had developed

---

01-DDC) 2015 WL 685845, at pp. *2, *5, *14, *16 [drilling a one-quarter inch hole "where the windshield meets the dash"].)

[11] The underlying facts of the case are set forth in the magistrate judge's recommendation and report. (*United States v. Rodriguez-Quiros* (D.Nev., May 19, 2009, No. 2:08-CR-0256-RLH-PAL) 2009 WL 10679310, at pp. *3, 13-*14.) Although the magistrate judge recommended suppressing the seized evidence on the grounds the search exceeded the scope of consent and that probable cause was lacking (*id.* at pp. *13-*14), the district court rejected the recommendation and found "sufficient probable cause to believe that the bumper contained contraband and justified the further act of drilling an additional hole . . . to confirm that justifiable belief" (*United States v. Rodriguez-Quiros* (D. Nev. July 14, 2009, No. 2:08-CR-0256-RLH-PAL), 2009 WL 10679311, at p. *1.) The Ninth Circuit upheld the district court's probable cause finding. (*United States v. Rodriguez-Quiros, supra,* 442 Fed.Appx. at pp. 347-348.)

probable cause before the drill search.  Accordingly, the trial court did not err in denying Lopez's suppression motions.

## II. *Testimony About Lopez's Prior Drug Trafficking Activity*

On cross-examination during trial, Lopez's counsel asked Agent Aldaco whether he had a reason to stop Lopez other than the countersurveillance driving measures.  Aldaco responded that he did—Lopez's vehicle or a similar one had been involved in prior drug trafficking activities.  Lopez contends the trial court erred by denying his motion for a mistrial based on this testimony, or, alternatively, that his counsel was ineffective for eliciting it in the first place.  Neither contention has merit.

### A. *Background*

At the outset of cross-examination, defense counsel questioned Aldaco about why he stopped Lopez's vehicle.  Aldaco explained it was because of Lopez's countersurveillance driving maneuvers and concern that Lopez might slip back into Mexico.  The following series of questions, objections, and answers about Aldaco's reasoning ensued:

> "Q.  All right.  But legally, there is no law against somebody conducting countersurveillance, if that's all they're doing, correct?
>
> "[Prosecutor]:  Objection.  Relevance, your Honor.
>
> "THE COURT:  Overruled.  [¶]  You may answer.
>
> "[Aldaco]:  Say that one more time.
>
> "[Defense Counsel]:  What I'm saying is you've told us why you did it.  You had suspicions, but you did not have a legal reason to believe that this defendant was committing a crime.
>
> "[Prosecutor]:  Objection.  Relevance, your Honor.
>
> "THE COURT:  Sustained on other grounds.  [¶]  Do not answer that question.

"[Defense counsel]: [¶] I'm not trying to go into whether this was a lawful stop or not a lawful stop. I'm just asking, other than this countersurveillance stuff, you didn't have probable cause to believe that he was a drug violator?

"[Aldaco]: I don't need prob--

"[Prosecutor]: Same objection, your Honor.

"THE COURT: Overruled. [¶] You may answer.

"[Aldaco]: The reason that I need is a reasonable suspicion, not probable cause to stop that person. *And knowing and having knowledge that that vehicle had been linked to other narcotic seizures, a similar compartment, similar type of drug, same make and model -- or not --different make, but the same model or same frame*, and knowing all those indicators led me to believe there was enough reasonable suspicion to conduct a vehicle stop." (Italics added.)

A few moments later, after Aldaco was excused and the court was in recess, Lopez's counsel moved for a mistrial. Counsel explained he was "basically . . . calling 'no fairzees' " because Aldaco mentioned prior transactions the prosecution had not disclosed during discovery.

The prosecutor represented to the court that he had provided discovery "over a year ago" showing links between Lopez and a 2017 vehicle-crossing and drug transaction, which the prosecutor had not raised in his case-in-chief because it "seem[ed] remote." The prosecutor explained he objected to defense counsel's questions because the parties had already litigated the validity of the traffic stop during the suppression hearings. The prosecutor argued Aldaco had no choice but to answer the question honestly.

The court then stated, "I can't even remember what the response was," and asked defense counsel if he wanted the testimony stricken. Counsel responded he had not contemporaneously moved to strike because he "didn't want to bring undue attention to" the challenged testimony. The court stated it wanted to look at its notes before ruling.

After doing so, the trial court denied the motion for mistrial. First, the court accepted the prosecutor's representation that he had provided discovery about the prior incident, and noted the prosecutor had not raised the issue in his case-in-chief. Second, the court found Aldaco's response "that referred to [Lopez] perhaps being involved in other . . . drug transactions was very brief and in passing, [and] elicited by the defense." Finally, the court found that defense counsel's reason for not objecting contemporaneously "was a strategic decision" and, thus, did not constitute ineffective assistance.

## B. *Relevant Legal Principles*

"In general, 'a motion for mistrial should be granted only when " 'a party's chances of receiving a fair trial have been irreparably damaged.' " ' [Citation.] 'We review a ruling on a mistrial motion for an abuse of discretion. [Citations.] A trial court should declare a mistrial only " 'if the court is apprised of prejudice that it judges incurable by admonition or instruction.' " ' " (*People v. Bell* (2019) 7 Cal.5th 70, 121.)

## C. *Analysis*

### 1. *No Error in Denying Motion for Mistrial*

The trial court did not abuse its discretion by denying Lopez's mistrial motion.

First, as the trial court observed, the testimony on which Lopez based his motion was "elicited by the defense." Because Lopez "is responsible for the introduction of the evidence, he cannot complain on appeal that its admission was error." (*People v. Moran* (1970) 1 Cal.3d 755, 762; see *People v. Carpenter* (1999) 21 Cal.4th 1016, 1062 [appellant "may not assert that testimony he elicited himself was itself inadmissible"]; *People v. Williams* (1988) 44 Cal.3d 883, 912 ["It is axiomatic that a party who himself offers inadmissible evidence is estopped to assert error in regard thereto."]; *People*

*v. Kozel* (1982) 133 Cal.App.3d 507, 519-520 [no error where "a reading of the record discloses that the [challenged testimony] was related not on direct but on cross-examination. Where error, if it was error, is brought into the record by appellant, he may not complain of it on appeal."].)

Second, on the merits, the trial court did not abuse its discretion in concluding Aldaco's testimony was not so prejudicial that Lopez could not receive a fair trial. To begin with, although Aldaco initially testified "that *that* [i.e., Lopez's] vehicle had been linked to other narcotic seizures" (italics added), Lopez acknowledges that Aldaco immediately made a "clarification that *implicated a car similar to* [*Lopez*]*'s car rather than* [*Lopez*]*'s actual car and* [*Lopez*] *himself*." (Italics added.) Lopez's assertion that "[m]embers of the jury likely did not pick up on [this] vague and unclear clarification" is unavailing.

The nonprejudicial nature of Aldaco's testimony is further borne out by the fact the trial court was not even sure which testimony Lopez was challenging ("I can't even remember what the response was"). The trial court was best situated to determine the testimony's prejudicial impact, if any. (See *People v. Dunn* (2012) 205 Cal.App.4th 1086, 1094 ["Whether a particular incident is so prejudicial that it warrants a mistrial 'requires a nuanced, fact-based analysis,' which is best performed by the trial court."].)

Moreover, even if Aldaco had testified unequivocally that Lopez was involved in prior drug trafficking, the testimony was not necessarily unduly prejudicial in light of its probative value. "To obtain a conviction for possession of a controlled substance for sale, the prosecution must prove that the defendant had knowledge of both the presence of the contraband and its illegal character. [Citation.] Prior incidents of possession of an illegal drug are relevant to prove the knowledge element." (*People v. Ghebretensae* (2013)

222 Cal.App.4th 741, 754; see *People v. Torres* (1950) 98 Cal.App.2d 189, 192 [evidence that the defendant's car had previously been seized for possession of marijuana "was relevant to establish [his] knowledge of the presence of . . . mari[j]uana cigarettes in the car" on a later occasion].) A limiting instruction that the jury may consider the prior conduct "for the limited purpose of determining whether [the defendant] was aware of the presence of the substance" is usually sufficient to avoid prejudice. (*Ghebretensae*, at p. 755.)

Lopez contends Aldaco's testimony must have been prejudicial because, whereas the jury in Lopez's first trial could not reach a verdict, the jury in the second trial found him guilty. This contention presumes Aldaco's testimony was the only material difference between the two trials, which Lopez has not established. Indeed, it appears from the record that the prosecution substantially bolstered its showing in the second trial—the special agent who opined that Lopez's border-crossing patterns were inconsistent with those of an unknowing courier had not testified in the first trial.[12] It also appears from defense counsel's pretrial arguments in the second trial that Lopez testified during the first trial that "other people used [his] vehicle" and "he worked in a place where everybody had access to" it. However, Lopez did not testify similarly in the second trial. These differences, at a minimum, likely account more for the different trial outcomes than Aldaco's fleeting and ambiguous comment.

---

[12] We base this observation on the trial court's minute orders pertaining to the first trial (contained in the clerk's transcript), which do not mention the special agent. We cannot confirm this to a certainty, however, because the appellate record does not include the reporter's transcript of the first trial.

Finally, to the extent the trial court denied the mistrial motion on the basis of defense counsel's delay in bringing it—a premise that is unclear from the record—the delay did not constitute ineffective assistance (as Lopez contends) because counsel admitted he had a tactical reason for the delay. (See *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 86 [" ' " 'Tactical errors are generally not deemed reversible . . . .' " ' "]; *People v. Saldana* (1984) 157 Cal.App.3d 443, 463 [failure to move for a limiting instruction or to strike "was tactical" because "such a motion could only have served to call the jury's attention to the statement which defense counsel wished them to ignore"].)

## 2. *Lopez Has Not Established that His Counsel was Ineffective for Eliciting the Testimony*

Lopez's alternative contention—that his counsel performed ineffectively by eliciting Aldaco's testimony about the reasons for initiating the traffic stop—also fails.[13]

"When challenging a conviction on grounds of ineffective assistance, the defendant must demonstrate counsel's inadequacy. To satisfy this burden, the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms. Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. When examining an ineffective assistance claim, a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance. It is particularly difficult to

---

[13] We note the Attorney General did not directly respond to this claim.

27

prevail on an *appellate* claim of ineffective assistance. On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

Lopez has not established either prong. First, at a minimum, Lopez's counsel's persistent questioning—in the face of the prosecutor's persistent objecting—indicates counsel had some undisclosed tactical or strategic reason for his questions. This is borne out by the fact defense counsel similarly questioned Agent Beltran, in an apparent attempt to suggest that because the agents did not see Lopez do anything illegal during the surveillance, that Lopez was *not* a knowing courier.[14] However, because the appellate record does not sufficiently reveal counsel's reasoning, we are unable to resolve the first prong on direct appeal.

Second, and in any event, for the same reasons we conclude the challenged testimony was not sufficiently prejudicial to warrant a mistrial, we likewise conclude it was not sufficiently prejudicial for purposes of an ineffective assistance of counsel claim. (*Strickland v. Washington* (1984) 466 U.S. 668, 697 ["If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."].)

_____

[14] For example, defense counsel asked Beltran, "But are you willing to concede that you had not seen him do any overt criminal activity before you stopped him?"

### III. *Lopez Has Not Shown He Is Unable to Pay the Assessments*

Lopez contends the trial court's imposition of $5,014 in monetary assessments[15] without first determining his ability to pay them violated his due process rights as enunciated in *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*).[16] Because Lopez raised his claimed inability to pay during the sentencing hearing, we construe his appellate challenge as being directed at the trial court's rejection of that claim (as opposed to a claim the trial court deprived him of an opportunity to make such a showing).[17] We conclude Lopez has not met his burden to show he is unable to pay the assessments.

---

[15]    These consisted of the following: a $3,900 restitution fine (§ 1202.4, subd. (b)) and corresponding, stayed supervision-revocation fine (§ 1202.45); an $80 court security fee (§ 1465.8); a $60 criminal conviction assessment (Gov. Code, § 70373); a $154 criminal justice administration fee (Gov. Code, § 29550 et seq.); a $615 drug program fee (Health & Saf. Code, § 11372.7); and a $205 lab analysis fee (Health & Saf. Code, § 11372.5).

[16]    In *Dueñas*, *supra*, 30 Cal.App.5th 1157, the Court of Appeal for the Second District, Division Seven, held that imposing assessments and a fine on an indigent defendant violated due process-based rights that ensure access to the courts and bar incarceration based on nonpayment of fines due to indigence.  (*Id*. at pp. 1167-1168, 1172.)

[17]    To the extent Lopez purports to raise the latter claim, he forfeited it by failing to request such a hearing in the trial court.  Although courts are split over whether a defendant's failure to assert a due process challenge to monetary assessments at sentencing forfeits the issue for appeal, the courts that have declined to find a forfeiture have generally done so on the grounds the *Dueñas* decision "represent[ed] an unforeseen significant shift in the pertinent law that trial counsel could not have anticipated, thus excusing the failure to raise the issue."  (See *People v. Santos* (2019) 38 Cal.App.5th 923, 931 (*Santos*).)  Here, however, Lopez was sentenced more than two months after *Dueñas* was filed.  Accordingly, Lopez had no reason not to expressly invoke *Dueñas* as the basis for an opportunity to make a further showing.

## A. *Background*

After trial, the probation officer recommended that the court impose a 13-year split sentence, a restitution fine of $7,800, and the other assessments described in footnote 15, *ante*.

At the sentencing hearing, defense counsel "ma[d]e what [he] consider[ed] to be a heroic argument"—that the trial court should grant Lopez probation so he could be deported to Mexico without U.S. taxpayers first paying $100,000 to imprison him, only to deport him anyway at the end of his sentence. The trial court denied the request and imposed the 13-year split sentence recommended by probation. The court also imposed the recommended fines and fees, but reduced the recommended $7,800 restitution fine to $3,900.

After the court announced the monetary assessments, defense counsel "ha[d] one more heroic suggestion":

> "Will the Court allow his fines and fees to be deemed satisfied by his time in custody? Because here's the problem. He's going to be deported. He has no real ability to pay those fines and fees. So what we do is we end up setting him up for failure of probation because he's not going to be here. He's not going to be able to pay those fines and fees."

The court declined the request, noting the court had already reduced the recommended restitution fine by half.

## B. *Relevant Legal Principles*

The weight of authority provides that a defendant challenging monetary assessments on inability-to-pay grounds bears the burden of demonstrating his or her inability to pay.

As to restitution fines, when a defendant challenges a fine exceeding the statutory minimum amount ($300) on inability-to-pay grounds, the

"defendant shall bear the burden of demonstrating his or her inability to pay." (§ 1202.4, subd. (d).)

As to other monetary assessments, although the *Dueñas* court suggested the prosecution bears the burden of establishing the defendant's ability to pay (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1172), many courts—including our own and a different panel of the *Dueñas* court—have since held that the defendant bears the burden of establishing his or her inability to pay (see, e.g., *People v. Kopp* (2019) 38 Cal.App.5th 47, 96, rev.gr. Nov. 13, 2019, No. S257844; *People v. Castellano* (2019) 33 Cal.App.5th 485, 490; *Santos*, *supra*, 38 Cal.App.5th at p. 934). The issue is currently pending before the Supreme Court in *Kopp*. Pending further guidance from the high court, we will follow the cases holding that the defendant bears the burden of establishing his or her inability to pay.

## C. *Analysis*

Lopez has not met his burden of establishing he is unable to pay the court-ordered assessments. His only showing was his counsel's claim that because Lopez would likely be deported to Mexico following his release from custody, "[h]e has no real ability to pay those fines and fees." The record contradicts this claim.

Lopez testified at trial that, before his arrest, he ran a carpentry business in Mexico. Most of his jobs were in Mexico, with only a few in San Diego. He told the probation officer he earned $2,000 to $3,000 per month "by performing carpentry jobs *in Tijuana* and San Diego." (Italics added.) Not surprisingly, then, Lopez testified at trial, "I don't have financial problems" and "I don't have money problems." Although Lopez's ability to earn money as a carpenter obviously will be interrupted while he is in

custody, he has made no showing that he will be unable to resume such work upon his release.

## DISPOSITION

Affirmed.

HALLER, J.

WE CONCUR:

McCONNELL, P. J.

IRION, J.